```
 1            IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                   SHERMAN DIVISION

 3

 4   IN RE:                    )   BK. NO: 23-42102-BTR

 5                             )

 6   REMARKABLE HEALTHCARE, LLC)

 7   REMARKABLE HEALTHCARE of  )

 8   DALLAS, LP; REMARKABLE    )

 9   HEALTHCARE of FORT WORTH, )

10   LP; REMARKABLE HEALTHCARE )

11   of SEGUIN, LP             )

12        D E B T O R.         )

13

14            *  *  *  *  *  *  *  *  *  *

15              TRANSCRIPT OF PROCEEDINGS

16            *  *  *  *  *  *  *  *  *  *

17

18

19

20      BE IT REMEMBERED, that on the 13th day of November,

21   2023, before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

1                          <u>I N D E X</u>

2                                                    <u>PAGE</u>

3   <u>JON McPIKE</u>

4        DIRECT EXAMINATION
             BY:  Mr. Castillo                        25
5        CROSS-EXAMINATION
             BY:  Ms. Klein                           40
6            BY:  Mr. Carruth                         54
         REDIRECT EXAMINATION
7            BY:  Mr. Castillo                        59

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2              COURTROOM DEPUTY:  Remarkable Healthcare of

3  Carrollton, LP, case number 23-42098.

4              THE COURT:  Okay.  Appearances.

5              COURTROOM DEPUTY:  I'm sorry, I was going to

6  call all of them.

7              THE COURT:  Oh, okay.

8              COURTROOM DEPUTY:  Remarkable Healthcare of

9  Dallas, LP, 23-42099; Remarkable Healthcare of Fort Worth,

10 LP, 23-42100; Remarkable Healthcare of Seguin, LP, 23-42101;

11 and Remarkable Healthcare, LLC, 23-42102.  Notice of

12 designation of complex Chapter 11 Bankruptcy cases; motions

13 for joint administration; motions to limit or restrict

14 notice; motion for authority to use cash collateral; and

15 motion -- sorry, motion to pay pre-petition salaries and

16 wages; and complex Chapter 11 motion.

17             THE COURT:  Okay.  Let's start with the joint

18 administration and the designation as complex case.

19      But I guess before we do, I'll take all of the

20 appearances.

21             MR. CASTILLO:  Mark Castillo and Taylor Gray

22 of Carrington Coleman on behalf of the debtors.  And also

23 present in the courtroom as debtor representatives are Laurie

24 Beth McPike, Jon Eric McPike, and Diane Ayoubi McPike, good

25 afternoon.

1                    THE COURT:  Okay.

2                    MS. KLEIN:  Good afternoon, Your Honor.

3  Buffey Klein on behalf of Alleon Capital Partners.

4                    MR. CARRUTH:  Good afternoon, Your Honor.

5  Jeff Carruth on behalf of Kilgore Property Management, LLC

6  and then the four landlords; KRS Carrollton, LLC; KRS Dallas,

7  LLC; KRS Fort Worth, LLC; KRS Seguin, LLC.  And I have

8  Mr. Joshua Kilgore in the courtroom with us also today.

9                    THE COURT:  All right.  Thank you.

10                    MR. GREEN:  Good afternoon, Your Honor.

11  Gordon Green on behalf of Regions Bank.

12                    THE COURT:  All right.  And we have a

13  telephonic appearance?

14                    MR. VARDEMAN:  John Vardeman appearing for the

15  United States Trustee, Your Honor.

16                    THE COURT:  Okay.

17                    MR. BUTLER:  Yes, Your Honor.  James Butler on

18  behalf of Alleon Capital.  And I have two client

19  representatives on the line.

20                    THE COURT:  Okay.  All right, Mr. Castillo.

21                    MR. CASTILLO:  All right, Judge.

22       As to the notice of complex case and joint

23  administration to take those first.  Those are unopposed.  We

24  have filed those in each of the five debtor cases.  The

25  reason we think that they are deserving of complex case

1  treatment is due to the number of creditors and the issues

2  that are going to relate to these debtors.

3       The debtors have facilities in Prestonwood, Dallas,

4  Fort Worth, and Seguin.  There are four facilities in total

5  with approximately 270 resident patients.  The debtors have a

6  fifth entity which is an LLC which is the management entity.

7  Because of the several hundred resident patients, the several

8  hundred employees, and these hundreds of creditors in these

9  cases, we think complex case treatment would make sense.

10  There also are very urgent matters that we are having to deal

11  with that you would see in a typical Chapter 11, including

12  cash management and pre-petition payroll, things of that

13  nature.  There also are urgent issues for our lender, Alleon

14  and our landlords.  And so that's what we have for complex

15  case treatment.  In terms of joint administration, we think

16  it will just help for the parties to have one case to come to

17  to handle all of the different pleadings and hearings.  So we

18  would ask the Court to approve complex case treatment and

19  joint administration.

20       And then one final comment.  As to our other motion for

21  limiting notice.  We originally were going to ask for

22  approval to send notice to the top 30 consolidated creditors.

23  In communications with the U.S. Trustee, we said we will just

24  do the top 20 for each debtor.  And so I think the shortened

25  notice motion at docket 11 is basically in compliance with

1   the Court's complex case procedures.  So it would have notice

2   to debtors, the U.S. Trustee, the ombudsman, the Sub V

3   Trustee, the secured creditors, and the top 20 unsecured

4   creditors of every debtor.  So I just mention that because it

5   does relate to the complex case.  It follows those

6   procedures.

7             THE COURT:  Okay.  Let's talk about joint

8   administration first, because I have some questions.

9        Do you have the same creditors in all of the cases that

10  you are seeking to jointly administer?

11            MR. CASTILLO:  A lot of overlap.

12            THE COURT:  Okay.  Explain that to me.  What's

13  the overlap?

14            MR. CASTILLO:  A lot of the debtors have the

15  same pharmaceuticals.  And I think maybe the lawn service,

16  some of that might overlap.  Certainly the big issue is

17  Alleon, the secured lender.  They have liens on all

18  receivables of all of the debtors.

19            THE COURT:  Okay.

20            MR. CASTILLO:  So tons of overlap there.  The

21  debtors also overlap on the bank accounts.

22            THE COURT:  Okay.  Just so I know -- oh --

23            MR. CASTILLO:  At Regions.  At Regions.

24            THE COURT:  Okay.  We'll talk about that in

25  just one moment.

1      When you say the secured lenders have liens on all of

2   the accounts receivable for all of the various debtor

3   entities, are there separate loans to each of the debtors?

4   What exactly is going on there?  What's the relationship?

5                    MR. CASTILLO:  I think it's one set of loans,

6   Judge, that will be -- let's see -- at Exhibit 10 and then

7   all of the debtors are subject to it.  So there's one loan

8   and security agreement at Exhibit 10 behind Tab A.

9                    THE COURT:  So there's a single loan and you

10  basically --

11                   MR. CASTILLO:  The four facilities are the

12  four borrowers.

13                   THE COURT:  Okay.  So there are separate

14  facilities?  Separate --

15                   MR. CASTILLO:  Separate nursing facilities

16  rather than loan facilities.

17                   THE COURT:  Okay.  So I just want to

18  understand how it works.

19      If company A draws down on this loan of -- was it an

20  outright loan or is there a revolver?

21                   MR. CASTILLO:  It's a revolver in the sense --

22  well, Alleon took out a prior lender, Comerica, back in 2019.

23  And allowed the use of line of credit -- basically drew down

24  the entire line of credit to take out the prior lender.  And

25  over time the debtors have drawn against it and it has been

1  modified.

2           THE COURT:  Well, that's what I want to try to

3  understand.

4      Okay.  If debtor A drew down on the loan, let's say

5  they drew down a million dollars --

6           MR. CASTILLO:  Okay.

7           THE COURT:  Okay.  Then the collateral for

8  that $1 million is receivables of all of the debtors?

9           MR. CASTILLO:  That's correct.  All of the

10  debtors would be liable.

11           THE COURT:  Okay.  So you have a secured

12  lender who has a single facility against all of the various

13  debtor entities, plus you have various trade creditors, like

14  the pharmaceutical companies that provide medicines, I guess,

15  pharmaceutical meds to all of those separate -- all of the

16  different facilities; is that right?

17           MR. CASTILLO:  Correct.  And --

18           THE COURT:  So would the top 20 look pretty

19  much the same between all of them?

20           MR. CASTILLO:  There's some overlap.  I can't

21  say they're the same, though.

22           THE COURT:  Okay.  But there's a

23  significant --

24           MR. CASTILLO:  If we look at Exhibit 1, so you

25  will see like the very first one is a big one, Blue

1 Cross/Blue Shield.  That is throughout out all of the

2 debtors.

3             THE COURT:  Okay.

4             MR. CASTILLO:  Then you'll see Medline

5 Industries.  That is throughout all of the debtors.  And

6 you'll see Performance Food Service.  So you'll see a lot of

7 overlap.  And towards the bottom, there might be some

8 changes.  But the top ones are the same.  And I will add,

9 Judge, that although there are four different landlord

10 entities, the four landlord entities are related.  So

11 effectively we have one landlord entity, or counsel, or party

12 to deal with in the cases.

13             THE COURT:  Okay.

14             MR. CASTILLO:  And, also, we would likely have

15 one patient care ombudsman.  We're looking at -- we spoke

16 with Patty Ducayet.  It may end up being Susan Goodman.  But

17 whoever it ends up being is going to be the same ombudsman

18 for each of the debtor cases.  And then Mark Weisbart is the

19 Sub V Trustee, and he's the same Trustee in every case, as

20 well.

21             THE COURT:  Okay.  Tell me how large would the

22 creditors' matrix be in each of the cases but for this

23 limited notice that you're seeking?

24             MR. CASTILLO:  I think we hit over 500.

25             THE COURT:  In each case?

1          MR. CASTILLO:  Oh, sorry.  In each case, no.

2    On a consolidated basis, I think we were at 500.  It was 52

3    pages, I think, three column, about 13 per row.

4          THE COURT:  For each creditor?  I mean for

5    each debtor entity?

6          MR. CASTILLO:  On a consolidated basis.  So

7    let's see.  That's about -- that's almost 2,000.  So, yeah,

8    it would come out to about 4 to 500 per debtor, I guess, at

9    that number.

10          THE COURT:  Okay.  All right.  How much is the

11   debt, the total debt for each of the debtors?

12          MR. CASTILLO:  You're looking at about 3.4

13   million to Alleon in total for all combined debtors.  You're

14   looking at about 1.3 million to the landlords for September,

15   October, November rent.  And then I think we're looking at

16   maybe another the unsecured pool besides landlord it sounds

17   like would maybe be around the $1 million mark, if not lower.

18          THE COURT:  Okay.  So this is -- because you

19   elected Sub V -- I, frankly, have never had a Sub V case seek

20   to be a complex case.  Those two concepts seem inconsistent.

21          MR. CASTILLO:  That's exactly the conversation

22   we had.  And we looked to see if there was anything that

23   barred it.

24          THE COURT:  Well, yeah.  For complex cases

25   we're looking for cases where there's more than $10 million

CINDY SUMNER, CSR (214) 802-7196

1    in debt usually and a large number of parties in each case in

2    the case.  And that there's some publicly traded debt, for

3    example, some other reason.  So what I'm looking at is, what

4    I'm hearing is you all want to elect Sub V treatment, but you

5    want to have a shortened mailing matrix, for one thing.

6                   MR. CASTILLO:  That's key.

7                   THE COURT:  Is there something else?

8                   MR. CASTILLO:  Because the Court has been

9    really good about being available for emergency hearings and

10   available for that --

11                  THE COURT:  We're always available.  I

12   can't --

13                  MR. CASTILLO:  That's the other, you know,

14   real benefit you get from complex.

15                  THE COURT:  Well, not in our court.  Because

16   whether you're complex or not if you call and say, gee, whiz,

17   Judge, we need a hearing day after tomorrow because the sky

18   is going to fall, you get a hearing day after tomorrow.  So

19   we really haven't had that issue.  It's just a matter of

20   filing your motion and contacting the courtroom deputy about

21   getting a quick setting, right?

22                  MR. CASTILLO:  Yes.

23                  THE COURT:  And have you all had any problems

24   getting that in any matter?

25        Okay.  All right.  So this is what I'm inclined to do

1   is given the size of this case, it seems to me it's

2   appropriate to try and keep costs down --

3           MR. CASTILLO:  Yes.

4           THE COURT:  -- to a minimum.  And so I'm

5   inclined to limit notice, at least in the first instance, to

6   the parties that you are suggesting on your shortened notice

7   list, plus anyone else who makes an appearance in the case

8   afterwards.  You have to add them to your shortened list and

9   anyone else who requests notice.

10          MR. CASTILLO:  Okay.

11          THE COURT:  So I would like that added.

12      Does anyone else wish to be heard with respect to

13  either joint administration or the complex case designation?

14      Okay.  So we're not going to treat this as a complex

15  case.  We will grant the request to shorten notice.  So if

16  you'll submit an order on that with the shortened notice list

17  and also adding the two additional parts, which is anybody to

18  makes an appearance and anyone that you get a request from,

19  request for notices.  I will grant the motion for joint

20  administration.  But I would like the caption to include the

21  names of all of the debtors, okay.  So the caption instead of

22  just having the lead case, et al., I would like the caption

23  to have the names of all of the debtors and then saying

24  jointly administered under case number, right.

25          MR. CASTILLO:  Do you prefer the names in the

1  actual caption above or in a footnote?

2              THE COURT:  In the caption would be good.

3      Let's see here.  And I would like you to send out one

4  notice to your matrix, to everybody to let them know that we

5  have shortened the -- that we shortened the list and that --

6  the service list.  And if they wish to be included, they need

7  to file something.

8              MR. CASTILLO:  Got it.

9              THE COURT:  So that you get the notice in

10  writing.  I just want that one notice to everybody after that

11  we do just the shortened notice.  Okay?

12             MR. CASTILLO:  Will do.

13             THE COURT:  All right.  And, let's see here.

14  And then as far as hearings go, as a typical matter in

15  complex cases or otherwise in Chapter 11 cases, typically we

16  have hearings on the docket days on a Tuesday.  And if it's a

17  matter that you expect to be uncontested, we set it on the

18  morning docket.  If it's going to be contested, we would set

19  it -- do a special setting on the afternoon docket.  That's

20  what we typically do.  If for some reason you need the

21  hearing before the next docket, or whatever, you just need to

22  request it and we'll get it scheduled for you.  Okay.

23             MR. CASTILLO:  Gotcha.

24             THE COURT:  Okay.  All right.  Now should we

25  turn to the other matters, then?

1              MR. CASTILLO:  Yes, Judge.

2         So for the other matters I'll do an opening and then I

3    do have a witness or two from Remarkable to briefly walk the

4    Court through cash collateral, pre-petition payroll, and cash

5    management.

6         For purposes of the opening, we have been in

7    communication with numerous counsel on various issues

8    throughout the last few days.  And I think we're very close

9    with a couple of parties, Alleon, the lender, and the

10   landlord with respect to the remaining issues of cash

11   collateral.  And then with Regions we have some language to

12   add to the cash management motion and order.  And as to

13   pre-petition payroll, there's no objection to that.  But, of

14   course, subject to cash collateral being authorized.

15        So what we have is for cash collateral is we do have a

16   revised budget.  And if I may, I will have a witness testify,

17   to the extent necessary, but I do have exhibits that have

18   been filed this morning on Exhibits 1 through 15.

19              THE COURT:  Okay.  Are you offering those

20   exhibits?

21              MR. CASTILLO:  Yes, Your Honor.

22              THE COURT:  Okay.  So any objections to

23   Exhibits 1 through 15?

24              MR. CARRUTH:  Need a book, please.

25              THE COURT:  Certainly.

1             MR. CARRUTH:  If you don't have enough, we can

2    share.  That's okay.

3        Thank you, Judge.

4             THE COURT:  Ms. Klein, did you have any

5    objection?

6             MS. KLEIN:  I'm sorry.

7             THE COURT:  Did you have any objection?

8             MS. KLEIN:  Well, I mean, we're just trying to

9    see what they are.

10            THE COURT:  Okay.  You may proceed.

11            MR. CARRUTH:  Yeah.  Maybe if he just

12   starts -- if he could start, I think we can look along.

13            MR. CASTILLO:  So real quick, 1 is the

14   shortened notice that we covered just briefly.  2 is the

15   revised interim cash collateral budget that was circulated

16   this morning via email to Mr. Carruth and Ms. Klein and

17   Mr. Butler and Mr. Vardeman.  So Exhibit 2 is a revised

18   budget from what was filed previously on the 8th at docket

19   13-1.  It is trimmed down.  One thing that has been removed

20   is pre-petition taxes that have been zeroed out.  Another

21   thing that has been zeroed out based on discussion with the

22   Sub V Trustee and the ombudsman are the Trustee and ombudsman

23   fees for the first few days.

24            THE COURT:  Okay.  When you're saying taxes

25   that have been zeroed out, what --

1                     MR. CASTILLO:  Pre-petition payroll taxes were

2    going to be paid in the prior budget, it has been taken out

3    based on --

4                     THE COURT:  Why?

5                     MR. CASTILLO:  The landlord has objected to

6    the payment of -- this is pre-petition payroll taxes.

7                     THE COURT:  Okay.  But --

8                     MR. CASTILLO:  So --

9                     THE COURT:  Hold on a minute.  You're talking

10   about 941 taxes that you collected that you withheld from

11   your employees' paychecks?

12                    MR. CASTILLO:  A portion.  About 50 grand of

13   that is 941.

14                    THE COURT:  Okay.  So that's not the debtors'

15   money, is it?  The debtor is only holding that in trust for

16   the employees to turn that over to the IRS.  Am I missing

17   something here?  So what's the objection?

18                    MR. CARRUTH:  It would --

19                    THE COURT:  It's not your collateral, right?

20                    MR. CARRUTH:  Well, correct.

21                    THE COURT:  Okay.  So how is it -- so what's

22   the objection, if it's not your collateral?

23                    MR. CARRUTH:  Just an observation about cash

24   flow, Your Honor.  That was a pre-petition -- that's a

25   pre-petition claim, even if it is trust funds.

1                    THE COURT:  Well, it's funds that are held,

2   right, that are held to pay those -- that obligation?

3                    MR. CARRUTH:  Understood, Your Honor.

4                    THE COURT:  And it's not your collateral,

5   right?

6                    MR. CARRUTH:  Correct.

7                    THE COURT:  Okay.  So what's -- again, that

8   doesn't necessarily fall within quote/unquote cash

9   collateral.  That is just funds that the Trustee -- that the

10  debtor is holding in trust for the payment of the payroll

11  taxes, right?  So what am I missing here?  Is there some

12  portion of that that you guys are objecting to?  I don't

13  understand.

14                   MR. CARRUTH:  We were just trying to free up

15  cash, Your Honor.  So, I mean, I can withdraw --

16                   THE COURT:  That doesn't free it up at all,

17  right?  What am I missing?  The debtor can't use that for

18  anything else.  Then they would be out of trust post-petition

19  and breaching their fiduciary duties, right?

20                   MR. CARRUTH:  Well, if it was --

21                   THE COURT:  If I'm holding your payroll taxes

22  in my hands and I don't turn it over to the IRS and I use it

23  for something else, I should be held liable, right?  That is

24  a breach.

25                   MR. CARRUTH:  Understood, Your Honor.  We can

1    live with it coming back in.

2                    THE COURT:  Okay.  What else you got?

3                    MR. CARRUTH:  The trust fund portion.

4                    MR. CASTILLO:  Just the trust fund.  We'll

5    confirm that it is just the trust fund.

6                    THE COURT:  Okay.  What other portion is there

7    in this payroll taxes?

8                    MR. CASTILLO:  I think it's the employer

9    portion is also included in what was originally filed.

10   And --

11                   THE COURT:  Is that your cash?  Is that your

12   cash collateral?  Is that cash collateral?  What am I

13   missing?  That's already been funded, right?

14                   MR. CASTILLO:  That has -- yeah, I think

15   that's probably cash collateral if it's the employees'

16   portion rather than the -- excuse me, the employer.

17                   MS. KLEIN:  The balance then, Your Honor,

18   would be considered my client's cash collateral.

19                   THE COURT:  Have these -- where are these

20   funds held, or how are they held?

21                   MR. CASTILLO:  They would be at Regions Bank

22   in the debtors' bank account.

23                   THE COURT:  Which bank account?

24                   MR. CASTILLO:  Let me get that for you, Your

25   Honor.

1          THE COURT:  Are these funds in the general

2   operating account or are these funds that have been

3   transferred to the payroll account?

4          MR. CASTILLO:  It's in a DACA account.  The

5   debtors have several.  Let me get to the bottom of that real

6   quick.

7       So each facility has an account, so there are four

8   accounts that are DACA commercial accounts.  And the money

9   from the vendors that are paying the debtors, the funds are

10  deposited in those -- in a DACA commercial account for each

11  debtor, for each of the four facilities.

12         THE COURT:  Okay.  So these funds have not

13  been transferred into --

14         MR. CASTILLO:  Have not been swept or anything

15  like that.

16         THE COURT:  Okay.  So how does that relate to

17  your motion to pay pre-petition wages and such?  I thought

18  I'd understood from you that there were no objections to

19  that.

20         MR. CASTILLO:  So this is --

21         THE COURT:  Are the pre-petition taxes not

22  included in the pre-petition salaries and wages motion?  I

23  usually see that it is, so I'm just trying to understand is

24  this sliced and diced differently?

25         MR. CASTILLO:  I think the difference might be

1  that Alleon already agreed to the use of cash collateral to

2  cover certain payroll payments on November 3rd and November

3  6th.  And so this cash collateral budget has November 7

4  through 22, so it's not going to have cash collateral use for

5  what already went out.  But the payroll motion should have

6  what already went out.  And so the numbers may not match up.

7            THE COURT:  Okay.  So --

8            MR. CASTILLO:  Because we had a separate

9  letter agreement and then a separate email that said, payroll

10 needs to go out now.

11           THE COURT:  For pre-petition, right?

12           MR. CASTILLO:  Yes.

13           THE COURT:  Pre-petition payroll.

14           MR. CASTILLO:  Yes, knowing that we had to

15 file a pre-petition motion for the Court.

16           THE COURT:  Okay.  So this motion to pay

17 pre-petition wages, salaries and wages is for --

18           MR. CASTILLO:  It's two weeks pre-petition --

19           THE COURT:  Uh-huh.

20           MR. CASTILLO:  -- and then two or three days

21 stub pre-petition.

22           THE COURT:  Okay.  So the -- are all of those

23 funds necessary to pay the pre-petition salaries and wages

24 motion the subject of this cash collateral motion?  In other

25 words, are the funds necessary to fund the pre-petition

1  salaries and wage motion included in your budget?

2              MR. CASTILLO:  They would be more than the

3  budget because the budget does not ask for Court approval to

4  pay the --

5              THE COURT:  What's already been paid, okay.

6              MR. CASTILLO: -- what Alleon already approved.

7              THE COURT:  Okay.  Let me back up.

8        If you take into account what's already been paid plus

9  what's in your cash collateral budget now, does that cover

10 100 percent of the pre-petition salaries and wages motion?

11             MR. CASTILLO:  Yes.  That should include --

12             THE COURT:  It does.  Okay.

13       So when you say you're taking, you're zeroing out the

14 taxes and now we're going to put back in the 941 taxes, is

15 there a delta that's not being paid and when and where --

16             MR. CASTILLO:  This is -- what was taken out

17 of the cash collateral budget --

18             THE COURT:  Uh-huh.

19             MR. CASTILLO:  -- was for September and part

20 of October that is older taxes that had not been paid in

21 September and October.  And what we had approval to pay with

22 Alleon was the period of mid-October to late October.  And so

23 what was in the cash collateral budget was September, prior

24 to the last two weeks.  The debtors failed to pay taxes for

25 September and half of October.  So we were trying to true it

1  up.

2               THE COURT:  Well, that's what I'm trying to

3  get to is like what part is not being funded?  Where's the

4  gap?

5               MR. CASTILLO:  Yeah.  So if this cash

6  collateral budget is approved, the gap will be -- if we don't

7  back in what we just talked about, the payroll withholdings,

8  trust fund amounts, if we don't do that, the debtors will

9  still be behind on paying September and half of October

10 payroll taxes.

11              THE COURT:  And how much are we talking about

12 there?

13              MR. CASTILLO:  Your Honor, it is about half of

14 September and all of October where the employee portion is

15 about 180,000 total.

16              THE COURT:  Okay.  And then the employer

17 portion is the same?

18              MR. CASTILLO:  A little bit less, but close.

19              THE COURT:  Okay.  So when is that going to be

20 paid?

21              MR. CASTILLO:  The debtors were in

22 communication with the IRS prior to this bankruptcy case and

23 were working out a resolution to get it paid by end of this

24 year, which is December.

25              THE COURT:  Okay.

1           MR. CASTILLO:  So it's been fast tracked to

2  get trued up.

3       The IRS has asked that September -- the half of

4  September be paid as soon as possible.  But they know that

5  the debtors owe this and they're working with them.

6           THE COURT:  Okay.  So you're going to add back

7  in all of the 941 taxes, right, for the pre-petition?

8           MR. CASTILLO:  The trust fund portion, yes.

9           THE COURT:  Okay.  Okay.  What else you got?

10          MR. CASTILLO:  And so then what we have in

11  Exhibit 3 is an AR aging report that shows the aging of the

12  debtors' AR.  It starts by entity, Carrollton then Dallas

13  then the next page is Fort Worth and Sequin.  The final page

14  is the total.  And you'll see at the bottom the total AR is

15  about 7.5 million.  Of course some of this is older.  I

16  believe what is within the funding agreement with Alleon, I

17  believe is 150 days or newer.  And I believe they borrow

18  about 85 percent of that.  So it's not -- even though the AR

19  is 7.5, the total amount that is subject to be borrowed

20  against is in the -- in the $5 million range.  It's less.

21  5.5 is the borrowing base per the debtors' latest aging, 5.5.

22      And then we have 4(a) and 4(b) is the pre-petition

23  wages that will be paid for October 16 through October 29 pay

24  period, and then October 30 through November 2, the little

25  stub.  Exhibits 5 through 9 are the UCC searches we ran.

1  What our testimony will illicit, Judge, is that Alleon is

2  really the only secured lender against cash and receivables.

3              THE COURT:  Okay.  So when you say -- let's

4  just tell me what the exhibits are so we can get through

5  whether we're going to admit them or not.

6              MR. CASTILLO:  Oh, yes, I'm sorry.  Yes.

7              THE COURT:  And then I'm gathering, based on

8  your comments, you don't have a first day affidavit

9  declaration, anything like that.

10             MR. CASTILLO:  No.

11             THE COURT:  Okay.  So we will have to take

12 some evidence.  So let's just get through the documents real

13 quick.

14             MR. CASTILLO:  So 5 through 9 are the  UCC

15 searches and reports from that.  10 is the Alleon loan

16 agreement and the various guarantees.  11 through 15 are the

17 proposed orders reflecting red lines based on comments from

18 other counsel.

19             THE COURT:  Okay.  Any objections to those

20 documents?

21             MS. KLEIN:  No objections from --

22             MR. CARRUTH:  No objections.

23             THE COURT:  All right.  Exhibits 1 through 15

24 are admitted.

25     Okay.  Now, you wish to present some evidence?

1            MR. CASTILLO:  We'll keep it brief, Judge,

2  yes.

3            THE COURT:  You may proceed.

4            MR. CASTILLO:  I'd like to call Mr. Jon McPike

5  to the stand, please.

6            THE COURT:  Mr. McPike, if you'll step forward

7  and be sworn.

8            (The witness was sworn by the courtroom deputy.)

9            MR. CASTILLO:  Your Honor, I'm going to place

10  on the witness stand an exhibit notebook that is the same as

11  counsel and Your Honor has.

12            THE COURT:  You may.

13                    <u>JON McPIKE</u>

14   The witness, having been duly sworn to tell the truth,

15  testified on his oath as follows:

16                <u>DIRECT EXAMINATION</u>

17  BY MR. CASTILLO:

18      Q.   Mr. McPike, would you state your name and position

19  with the debtors for the record.

20      A.   Jon McPike.  I'm the chief operating officer.

21      Q.   How long have you been in that role?

22      A.   13 years.

23      Q.   And what does that role include in its duties?

24      A.   My job is basically to oversee the day-to-day

25  operations of the four facilities.

1      Q.    And who do you work with at Remarkable on the

2   management team?

3      A.    Well, I work with Laurie Beth and Diane McPike.

4   And then I work specifically directly with the administrators

5   of each of the facilities and the leadership teams of the

6   buildings.  And then any regional personnel that we have.

7      Q.    Okay.  And can you briefly tell us the role that

8   Ms. McPike and Diane Ayoubi fulfill?

9      A.    Sure.  Laurie Beth McPike is the CEO/president.

10  She's over all of the operations of the company and basically

11  on a day-to-day basis she manages metrics and drives cash.

12  She manages and reviews all reports, all contracts, all

13  agreements.  And then manages each aspect of the company's

14  operations to make sure that we're efficiently operating.

15  Diane, she's the senior VP of operations, so she is in the

16  weeds when it comes to financial reports.  Some of the

17  operating issues within the facilities, she helps manage

18  those.  She works directly with the administrators and the

19  leadership teams of the facilities, as well, and all of our

20  vendors.

21     Q.    Okay.  Now as we look at some of the exhibits we

22  have in the notebook, we ran some UCC searches.  Those are

23  within Exhibits 5 through 9.  I'm going to ask you some

24  questions.

25         Alleon comes up, if you look, for example, on Exhibit

1    5(b).  You originally had a loan with Comerica Bank.  Can you

2    tell me about that briefly.

3        A.    Yeah.  We had three loans with Comerica Bank for

4    the opening -- lines of credits for opening new facilities.

5        Q.    Okay.  And as you flip a few pages into Tab 5(b),

6    for example, you'll see Alleon Capital Partners, LLC as an

7    assignee of Comerica's debt.  Who is Alleon?

8        A.    Alleon is the lender that we chose to go with and

9    they chose to go with us to pay off the Comerica debt and

10   offer us a line of credit to operate.

11       Q.    Okay.  And you'll see the filing date for this

12   assignment is June 12, 2019.  Do you see that?

13       A.    Yes.

14       Q.    Does that sound about the time that Alleon took

15   over the --

16       A.    Yes.

17       Q.    Okay.  And about how much currently would you

18   estimate is due to Alleon on your funding agreements?

19       A.    Summarized would be about 3.4 million.

20       Q.    Okay.  Now in some of these UCC-1 filings, which

21   are liens against the debtors' receivables, we'll see People

22   Fund.  Do you remember who People Fund is?

23       A.    People Fund was an organization in Dallas that

24   wanted to invest by granting a loan for the Dallas operating

25   cost to start that building up.  It was a new construction

1   project.  But their loan was either paid in full or a really

2   small portion of it was discharged in 2018, '19.

3        Q.   Okay.  So sitting here today or even as of the

4   petition date of November 2 of 2023, is anything due by the

5   debtors to People Fund?

6        A.   No.

7        Q.   What about Gordon Food Service, let's start with

8   that.  Are you familiar with Gordon Food Service?  They filed

9   a UCC filing.

10       A.   Yes.  Gordon Food Service was a food service

11   company that we used for all of about -- I'm not even sure we

12   used them for a full 30 days.  When we were trying to reduce

13   food costs, they wound up being more expensive than our

14   provider was that we had replaced them with.  So we

15   discontinued using them.

16       Q.   Okay.  As of the petition date of November 2, 2023,

17   do the debtors owe any money to Gordon Food Service?

18       A.   No.  They were completely paid.

19       Q.   What about Glazier Food Company, are you familiar

20   with them?

21       A.   I don't know who they are.  Except that I know that

22   Gordon Food bought them.

23       Q.   Okay.  As of November 2, 2023, do the debtors owe

24   anything to Glazier Food Company?

25       A.   No.

1     Q.   All right.  So can you think of any other secured

2  creditor, other than Alleon Capital Partners, that would have

3  a lien against the debtors' cash or AR?

4     A.   No.

5     Q.   If you look at Tab 3, Exhibit 3, it is a

6  receivables report.  It says, AR aging report as of November

7  6, 2023 at the top right.

8      Is this a document you've seen before?

9     A.   Yes.

10     Q.   And what is this?

11     A.   This is our AR aging as of 11/6/2023.

12     Q.   Okay.  Now, are these numbers accurate, to the best

13  of your knowledge?

14     A.   Yes.

15     Q.   At the bottom of the last page you'll see total of

16  7.494 million?

17     A.   Yes.

18     Q.   Okay.  And do you believe that's the total accounts

19  receivable that the debtors have as of November 6?

20     A.   Correct.

21     Q.   Okay.  Does that amount fluctuate?

22     A.   Yes.

23     Q.   Explain that to us, highs and lows.

24     A.   It fluctuates throughout the month, any given day.

25  So as we collect cash, those numbers will drop.  As we have

1   admissions and discharges, the numbers will fluctuate as well

2   with admissions and discharges in the current market.

3        Q.   Let's say for an average month of collectibles, how

4   much will the debtors collect on their receivables?

5        A.   Historically we've collected 1.9 to 2.1 million.

6   In the last six to eight months that number fluctuated to

7   anywhere from 1.4 to 1.9 or 2 million.  So our goal is to

8   collect that 2 to 2.1 million per month.

9        Q.   Have you had some problems in the recent past

10  collecting in that $2 million a month range?

11       A.   We have seen several -- several things that have

12  affected our ability to hit that number consistently in the

13  last six to nine months, yes.

14       Q.   And what are the issues?

15       A.   Well, one of the main issues is that in the

16  marketplace for skilled nursing we've seen a huge shift from

17  historical or traditional Medicare to managed care or

18  advantage plans.  DFW market used to run 50/50 depending on

19  whether you were in Tarrant or Dallas County.  Now it's

20  running 70 to 75 percent.  That's important because where

21  we've seen traditional Medicare as our highest payer, it's

22  now been -- we now see managed care/advantage plans taking

23  that census place.  So our census is now higher with the

24  managed care, almost double.

25       So what happens is the managed care plans -- Medicare

1   pays it when you bill them it's 14 days like clockwork,

2   unless there's something that hangs it up or they have a

3   request for information.  The managed care plans typically

4   take anywhere from 90 to 120 days.  And right now we're

5   seeing it take a little longer.

6        Q.   Okay.   I'd like you to turn to Exhibit 2, Tab 2.

7   And that is the November 7 through November 22 budget.  Is

8   this a document you're familiar with?

9        A.   Yes.

10       Q.   One thing we discussed earlier is that what's not

11  in this budget is certain payroll payments that have been

12  made by the debtors.

13       A.   Right.

14       Q.   Is it your understanding that Alleon agreed to

15  allow the funding of certain payroll obligations?

16       A.   That is what I understand.

17       Q.   And did the debtors do that?

18       A.   Yes.

19       Q.   And do you know that the debtors are not supposed

20  to pay pre-petition debt without Court approval?

21       A.   That's correct.

22       Q.   Okay.  And are the debtors seeking Court approval

23  to pay pre-petition payroll?

24       A.   Yes.

25       Q.   Including what has been paid?

1      A.    Correct.

2      Q.    And just so the Court knows, explain the

3  circumstances that some payroll has been paid, you know,

4  before the Court has had a chance to rule on that payroll

5  motion.

6      A.    What I heard you ask me was, explain the

7  circumstance of why we chose to do that?

8      Q.    Yes.

9      A.    Yes.  Because we needed employees to take care of

10  our patients.  And our pay period fell where our paychecks

11  were being to be handed out the day after we filed.

12      Q.    You filed November 2.

13      A.    So on November 3rd is payday.

14      Q.    Why did the debtors file for bankruptcy relief on

15  November 2?

16      A.    There are various reasons.  Frustrations with our

17  ability to get collected cash back in order to pay critical

18  vendors and payroll timely.  And then to give us some time to

19  be able to work with our landlord.

20      Q.    Okay.  Were the debtors concerned they were going

21  to be evicted?

22      A.    Yes.

23      Q.    And the lease terminated?

24      A.    Correct.

25      Q.    On the cash collateral budget at Tab 2, are we

33

1    talking about bare essentials or everything that the debtors

2    could think of?

3        A.    No.  This is as best we could put in here is bare

4    essentials to continue with quality patient care and to take

5    care of the employees that take care of the patients.

6        Q.    Okay.

7              MR. CASTILLO:  Your Honor, if I may represent

8    to the Court, I spoke with Mr. Weisbart, Sub V Trustee, and

9    then I've spoken with Ms. Susan Goodman and Ms. Patty Ducayet

10   for potential ombudsman placement.  And we dropped those

11   amounts down to zero in this budget knowing that they have to

12   go up once they're retained.  And I just say that for this.

13       Q.    Mr. McPike, do you understand that there will be a

14   Sub V Trustee in this case?

15       A.    Yes.

16       Q.    Do you have an understanding that he's going to

17   incur professional fees?

18       A.    Yes.

19       Q.    And that he wants to get paid?

20       A.    Yes.

21       Q.    And do you understand that there was going to be a

22   patient care ombudsman appointed in this case?

23       A.    Yes.

24       Q.    And that that ombudsman, whoever it turns out to

25   be, will require attorney's fees -- or professional fees to

1  be paid?

2      A.    Yes.

3      Q.    Okay.  And those will need to be in the forthcoming

4  budgets?

5      A.    Yes.

6      Q.    What will happen if the debtors do not pay their

7  pre-petition payroll to their employees?

8      A.    The employees will walk off the job and not -- not

9  work to take care of their patients.

10     Q.    How do you know that?

11     A.    Well, with -- with delays in paychecks that have

12 occurred as early as November 4th, we had multiple employees

13 quit just because they had trouble cashing their check at the

14 bank.  I've been in the nursing home industry or healthcare

15 since 1987.  And I know and have watched companies go through

16 this.  Most recently in 2000 and -- 2012 when a facility in

17 Southwest Fort Worth the owner walked in and announced that

18 he couldn't pay payroll and there was a mass walkout, the

19 employees walked right out of the building.

20     Q.    Now we haven't suffered that recently, have we?

21     A.    We have not suffered that, no.

22     Q.    And to the extent anyone has left recently, what

23 have the debtors done to handle that issue?

24     A.    Immediately in one facility we had to hire a very

25 small amount of agency staff to cover the weekend of the 5th

1  and the 6th of November.  The others, the employees have all

2  been retained or have remained.

3      Q.   Until we get a patient care ombudsman appointed in

4  these cases, how do we know that the resident patients are

5  being taken care of?

6      A.   Well, the company standard is going to win out on

7  that.  And that is that we provide quality services with

8  quality outcomes to our patients.  We still have -- even

9  though there's not an appointed ombudsman like the State

10  ombudsman that you're talking about with Patty, the local

11  ombudsman are still in the buildings weekly.  They're still

12  seeing our patients and talking to our administrators and

13  rounding.  And so we -- that system remains in place, even

14  though there hasn't been anything formal to the Court yet.

15      Q.   Okay.  Now in terms of patient care, does the cash

16  collateral budget allow the debtors to take care of patients

17  for that period?

18      A.   Yes.

19      Q.   One thing that Alleon wants for approval of cash

20  collateral is transparency.  Do you understand that?

21      A.   Yes.

22      Q.   So what kind of transparency have the debtors given

23  to Alleon before now?

24      A.   So Alleon has the ability to see all of our bank

25  accounts.  They can go on daily and look at everything that's

1   in every account.  We've provided them with their own logins

2   to the billing portals that we use.  We've given them managed

3   care portals so they can set up their own view, because we

4   can't do that for them, using our MPI number so they can see

5   our billings in those portals so that they can have some

6   comfort of the fact that we're actually billing

7   appropriately.

8        Q.   Do you agree to look at third-party billers getting

9   estimates and increasing the transparency with Alleon if they

10  agree to the use of cash collateral?

11       A.   What I heard you ask me is do we agree to look into

12  the possibility of having a third-party biller, yes.  We're

13  absolutely open to that discussion.

14       Q.   Okay.  And do you have any hesitancy on actually

15  retaining a third-party biller?

16       A.   We do.  Number one, it's never a smooth transition,

17  so there are always communication issues with a third-party

18  biller because they're not within your company.  Second would

19  be the cost.  It's an additional cost to the company that

20  takes away the money from both the lender, the landlord, and

21  the direct patient care that's unnecessary.

22       Q.   Okay.  But if you get to a point where Alleon ways,

23  we need to do this and this is someone that's coming in at a

24  reasonable rate, is that something that you're willing to

25  consider for the debtors?

1          A.    We're willing to have that discussion.

2          Q.    Okay.  And if there's something else that Alleon

3    wants for additional transparency, are you willing to

4    consider that, as well?

5          A.    We're open to any conversation.  Always have been.

6          Q.    The landlord would like to increase its

7    transparency, as well.  Do the landlords get any kind of

8    financial reporting to them from the debtors?

9          A.    They get -- they get quarterly financial reports

10   and they get monthly census reports.

11         Q.    Okay.  And what kind of data does that give them?

12   How does that help the landlord?

13         A.    Sure.  So the census reports each month show them

14   what the occupancy of the facilities are.  And then the

15   financial reports allow them to see whether or not the

16   company is soluble where it's a viable operation.

17         Q.    Okay.  If the debtor -- excuse me.  If the landlord

18   asks for third quarter financials to be provided to it for it

19   to consent to cash collateral, will you do that?

20         A.    Already sent today.  It's been sent today.

21         Q.    Okay.  What is PCC?

22         A.    That stands for Point Click Care.

23         Q.    Okay.

24         A.    That's our operating software.  It contains all of

25   our clinical information and data per patient.  It contains

1  all of our operating reports.  It contains all of our

2  financial reporting, our billing system.  It's an all-in-one

3  healthcare software.  So it does anything from electronic

4  patient data to the facilities' financials.

5      Q.   And is that going to have any kind of patient data

6  in it?

7      A.   Yes.  It has all of the HIPPA related protected

8  patient data.

9      Q.   Okay.  Now if the landlord would like PCC access

10  for it to consent to cash collateral, is there something you

11  can do to accommodate it --

12     A.   We actually have that ready to provide limited

13  access to certain specific financial reports that we've been

14  talking about for months now.  We're just waiting on an NDA

15  that we sent to be signed.

16     Q.   Okay.  Why is that important?

17     A.   Just, you know, the reports are specific to the

18  company.  And for us it's a matter of wanting to protect the

19  company from that data being shared to outside organizations

20  that are not part of the landlords' entity or outside of

21  Remarkable Healthcare.

22     Q.   Is -- is it accurate that the debtors are working

23  with the IRS to true up part of September and October payroll

24  taxes?

25     A.   Yes.

1      Q.   Okay.  Are the debtors on track to get that done?

2      A.   Yes.  And we're working through our accounting firm

3   who's helping us with that.

4      Q.   Who's that?

5      A.   That's a Diane question.

6      Q.   Oh, it's a Diane -- very good.

7       Okay.  But as far as you know, you're working with a

8   CPA for that --

9      A.   Turner & -- Turner & Stone, that's who they are.

10      Q.   Turner & Stone.

11      A.   Turner & Stone, yeah, yeah, that's right.  Turner &

12   Stone.

13      Q.   So is there anything that you need to tell the

14   Court to just be sure that -- we want to be sure the patients

15   and the residents are being taken care of.  Is there anything

16   going on that you can think of that puts them in jeopardy?

17   Has there been any kind of mass walkout by employees, or is

18   there failure to have medicines available, or any issues like

19   that that you need to report?

20      A.   No.  Currently we've been able to provide for all

21   of the needs of our patients and our staff.  And our vendors

22   have been absolutely amazing.  And we use -- for the -- for

23   90 percent of our vendors we use the same vendors for each

24   facility.  So they've been absolutely wonderful to work with.

25      Q.   Thank you.

1         And what we're asking is pretty quick, but it's a

2    truncated time frame.  Can you put into your words, is this

3    something that is to prevent immediate and irreparable harm

4    to the estates to use cash collateral?

5         A.    Yes.

6         Q.    Yes?

7         A.    Yes.

8         Q.    Okay.

9              MR. CASTILLO:  Thank you, Judge.  Pass the

10   witness.

11              THE COURT:  Cross?

12              <u>CROSS-EXAMINATION</u>

13   BY MS. KLEIN:

14        Q.    Good afternoon, Mr. McPike.  Buffey Klein on behalf

15   of Alleon.  I just have a couple of questions to make sure

16   that I understand the cash situation of the debtor.

17        So you testified that your collections range from 1.4

18   to 2.1 million; is that correct?

19        A.    Yes.

20        Q.    Can you tell me when the last time on a monthly

21   basis that you -- that the facilities collectively collected

22   2.1 million?

23        A.    Looking -- I was looking at those reports Friday

24   with Alleon on a conference call.  I know our billing said

25   2.1 twice this year and I think the actual collections were

1  1.9.  So I'm not sure we've hit 2.1 actual cash hitting the

2  bank since 2022.

3     Q.   And what precipitated that shortfall, that change

4  from what you were experiencing in 2022 to what we see

5  historically in 2023?

6     A.   Great question.  There are multiple things.

7     The first is we've seen the transition from straight

8  traditional Medicare to managed care that has caused

9  industry-wide cash delays as cash gets caught up.  During

10 that time frame we had a bit of a perfect storm.  We also had

11 a transition in our central billing office where we

12 transitioned personnel.  During that transition we saw a drop

13 that we immediately jumped on and made sure that we had the

14 right people doing the right thing so that we weren't -- our

15 billing wasn't getting delayed or wasn't getting done per our

16 timeline.  We operate off a billing schedule that's really

17 tight per payer.

18    We also had a brief hold at one of the facilities that

19 is no longer there for some trust fund -- for refunds that

20 were due from the company.  We've gotten that cleared up, but

21 that cost delays.  There was some internal issues that we had

22 with nursing assessments that we had to mange through.  And

23 we actually hired outside help consultants to work with our

24 MDS teams to make sure that those were completed timely so

25 that we didn't have billing delays.

1     So when you add up all of those together over the

2     course of the time that we're looking at, you can see where

3     we've had some success and we jumped up to 1.9 to $2 million

4     in collections.  I want to say one of those months was

5     August.  I can't remember the two or three times since then,

6     or after that.  And then now it looks like we finally got

7     that -- we're back on target.

8          Q.   So fair to say January 2023 you started to see a

9     decline in those collections?

10         A.   I remember it being after that.  But, again, I

11    don't have the spreadsheet in front of me that we reviewed.

12         Q.   And what modifications did you make to your

13    employees or to your operations to try to match your

14    operations to this realistic collection number?

15         A.   What I heard you ask me is what did we do to modify

16    our operations so that we could get back to collecting what

17    we were normally collecting?

18         Q.   Or while you were experiencing reduced collections,

19    how did you modify operations to try to -- to try to live

20    within those means?

21         A.   Oh, live within the means, yeah, yeah.

22         Well, we managed through making sure that we were

23    managing our overtime, our non-fixed costs, our variable

24    costs and expenses.  We managed those as low as we could.  We

25    made sure that we were expending all supplies before

1  reordering.  Each facility has a garage and a supply center,

2  so we were managing our costs and our orders through our --

3  we operate with a PO system where you can't spend anything in

4  the facilities without getting an approved PO first.  So we

5  managed those extremely tight.  We changed some vendors

6  during that time frame to vendors that were more cost

7  effective, like our food vendor, so that we could save money

8  that way, as well.

9      Q.  Do you recall earlier this year coming to Alleon

10  with a request to extend the borrowing base to include the

11  ERC credits?

12      A.  No, ma'am.  I did not approach Alleon to do that,

13  nor did anyone else from Remarkable Healthcare.

14      Q.  So you didn't modify the borrowing base to include

15  those funds?

16      A.  No, we did not.  They tried to get us to, but we

17  refused to sign that agreement.  So Alleon removed the ERC

18  funds from the agreement before we would sign it.  We did use

19  the ERC money to meet payroll and rent expectations after we

20  received it and it was used to pay -- it basically all went

21  to payroll and to rent during a couple of those -- to cover

22  several of those short collection months.

23      Q.  When would that be?

24      A.  I can't recall when that was.

25      Q.  Do you recall when you received the ERC funds?

1     A.    I don't recall.  I'd have to go look that up.

2     Q.    Do you recall setting up a separate bank account to

3  deposit those funds?

4     A.    No, ma'am.  We put those funds into the account

5  that Alleon allowed us to open for the COVID loans that we

6  received during the COVID years.

7     Q.    Did you adjust any of your payroll to try to

8  accommodate the lower collections?

9     A.    Well, we managed overtime and tried to manage

10  overtime better, which was a big reduction.  And then we --

11  so our company has a staffing philosophy that is in writing.

12  So we made sure through twice a week labor costs that the

13  facilities were following the labor model that we use, which

14  is based on census and acuity so that they weren't

15  overstaffing.

16     Q.    So when did you -- when was it that you determined

17  that you were not able to meet payroll and pay your 941

18  obligations?

19     A.    That issue occurred what was the first payroll

20  of -- that paid in October.  And it wasn't so much as an

21  issue of not being able to pay them, it was getting our funds

22  that we collected returned so that we could pay them.

23     Q.    Alleon worked with you throughout that time to

24  release funds to cover payroll; isn't that true?

25     A.    Yes, they did, very well.  We had paid Alleon down

1  from 2019.  They additionally loaned us 4.2 on less cash

2  collateral than they have now.  We paid them down, I think,

3  to about 2.1 to 2.2 and then wound up having to draw back

4  down on the line of credit, which they were great about.

5  They were great partners throughout that time for sure.

6      Q.    Have you received other funds other than the ERC

7  funds in the past six months that have been deposited in

8  other accounts other than the DACA accounts?

9      A.    Yes.  We received two insurance checks from filings

10  that we made related to damage to the buildings from

11  January/February's ice storm.

12      Q.    And what exactly were those funds meant to address?

13      A.    One check was is to pay vendors who did the

14  reconstruction work on the facilities.  And then one of them

15  was for lost revenue to the company.

16      Q.    And where were those checks deposited?

17      A.    Into the same savings account that we were allowed

18  to open for the COVID loans, the PPP loans.

19      Q.    How much was that in total?

20      A.    It was -- it was -- I don't know the answer to that

21  directly.  It was somewhere in the neighborhood of 200 and

22  something thousand.  I think it may have been a little more.

23  I can't remember the numbers of the checks.

24      Q.    And how have those funds been utilized to date?

25      A.    The checks are -- one check is in holding, sitting

1   in the account untouched.  And the other account check

2   currently has been used for emergency patient care needs.

3        Q.   And how much is remaining of those funds?

4        A.   I know the one check that was 200,000 is untouched.

5   And then I don't know what's left of the other one.  I think

6   the majority of it is still intact.

7        Q.   And are the use of those funds represented in your

8   budget that you've prepared?

9        A.   I don't -- I don't think so.  But I didn't -- I

10  don't know the answer to that.

11       Q.   What -- I know that currently I believe that the

12  amount outstanding to Alleon is approximately 3.4 million?

13       A.   That's correct.

14       Q.   And you're in an over-advanced situation; is that

15  correct, with Alleon?

16       A.   Technically that's correct.

17       Q.   And do you recall how much that over advance is at

18  this time?

19       A.   Well, it depends on whether -- which borrowing base

20  you look at.  If you look at the borrowing base that we

21  originally agreed to with them, then we're not over advanced.

22  There's actually plenty of AR to cover them.  If you look at

23  the borrowing base that they forced upon us by threatening

24  not to release cash unless we signed it, which is an average

25  of our overall collections over three months for a 30-day

1  period, then I think we're probably at a borrowing base of

2  somewhere between 1.8, I guess, or somewhere around that and

3  then whatever that is minus 3.4.

4      Q.    Currently -- when do you allege that this forced

5  agreement took place?

6      A.    Well, I know at one point there was one renewal in

7  December of this year.

8      Q.    December of 2022?

9      A.    2022 I mean, yeah.

10     Q.    But you continued to do business with Alleon, you

11 continued to borrow money from Alleon, you continued to

12 operate under the construct of the agreements that you

13 entered with Alleon; is that true?

14     A.    Yes.

15     Q.    Mr. McPike --

16     A.    Well, let me answer that.

17      Yes, but we've been -- we've been very close and prior

18 to filing were very close to moving the total credit facility

19 to another company.  And we were going through the due

20 diligence of that right before we filed.  And continue to

21 actually do that today with that company.  They're still

22 interested in doing business with Remarkable.

23     Q.    So how long have you been in due diligence with

24 that company?

25     A.    About two weeks, three weeks, maybe.  So Alleon

1   placed a chief restructuring officer into our company.  And

2   we work with him and he's been working to get that secured.

3        Q.   So we talked about 941 obligations.  I think you

4   went over that with your counsel.  How much -- how much do

5   you think that in total makes up?

6        A.   You mean the total employee plus employer portions?

7        Q.   Correct.

8        A.   I don't know that number, but I would assume it's

9   somewhere between -- I don't know that I've seen that number.

10  I know that the trust portion is around 180,000.  So the

11  employer portion should be a little bit less than that, so

12  I'm not sure what the number is.

13       Q.   So around 230, quarter million?

14       A.   230, maybe, yeah.

15       Q.   So when is the last time that the facilities paid

16  rent?

17       A.   August.

18       Q.   So about how much does that run per month?

19       A.   It increased a million dollars a year in March.  So

20  the rents each month are roughly 388,000 a month, I think,

21  400,000 a month, close to 400 a month.

22       Q.   And you haven't paid rent since August.

23       A.   Correct.

24       Q.   So you have August, September, October --

25       A.   No, we paid August.

1      Q.    You paid August.

2      A.    We haven't paid September or October.

3      Q.    September or October.

4      A.    And then obviously November.

5      Q.    So that's 1.2 million to the landlord?

6      A.    Correct.

7      Q.    About 250,000 on 941.  You're in negative territory

8  with my client.  What other large creditors do you have at

9  this time that have not been paid?

10     A.    I don't have any other large creditors that haven't

11  been paid.

12     Q.    With regard to the payroll checks that have gone

13  out, have those cleared the bank?

14     A.    I believe the majority of them have.  I still think

15  we have a few that haven't cleared.  And part of that is

16  because the checks -- our paychecks right now, some of the

17  banks put a hold on them for a period of up to two weeks.

18     Q.    How many of those checks were put on hold?

19     A.    I have no way of knowing that.  But I know that

20  several of the banks are doing that due to slow pay issues

21  due to late cash being provided back to the company from

22  Alleon which caused checks to not clear when they were

23  presented to the banks, several payrolls.

24     Q.    So do you know how much -- you don't know how much

25  would still be outstanding to those employees?

1      A.   I do not know the answer to that, no.

2      Q.   But we know that they're still --

3      A.   There are still a few out there that haven't

4  been -- as far as I know.  I don't look at those accounts on

5  a daily basis.  That's not what I do.

6      Q.   Okay.  But we do have to figure out if you have

7  enough cash to cover this and what kind of claims are going

8  to be made on the budget going forward.

9      A.   Yes.  That's been factored into the budget, though.

10     Q.   Okay.

11     A.   So we have the cash to cover any paychecks that get

12 presented from the payroll.

13     Q.   Okay.  So do you recall how much in ERC funds that

14 the facilities received?

15     A.   It was around $2 million.

16     Q.   So you received around 2 million.  Do you remember

17 when that came in?

18     A.   I don't.

19     Q.   Would you say in the summer?

20     A.   Some time during the summer.  It didn't come in at

21 once.  It was kind of funneled its way in.  So I don't

22 remember exactly when all of that came in.

23     Q.   So you received a $2 million cash influx from the

24 government some time in the summer.

25     A.   Uh-huh.

1      Q.   But subsequent to that we've seen a drop off in

2   collections.  We've seen debt accumulating.  So I guess what

3   additional operational changes are you planning to make to

4   try to address these shortfalls so that you can begin to pay

5   rent, you can service up my client's debt, you can continue

6   to operate?

7      A.   Sure.  We've taken most of that action already.  A

8   lot of that action is outlined in the email that was sent

9   November 2nd to Alleon, somewhere in that time frame.  Those

10  direct action steps, we will see our collections increase

11  from the efforts that we've already put in place, because

12  that money is still sitting in those buckets.  So it's still

13  collectible, it's still valid, it's still good -- those

14  receivables are still good.  We've just got to take the

15  manpower and make sure everything is completed on our end to

16  pull it through.  And when I say, manpower, most of those

17  insurance followups require us to get on the phone and spend

18  hours on hold getting them to clear up one claim for no

19  reason.  There's no valid reason for it to be hung up.  It's

20  the slow-pay tactics that the insurance companies used.

21  They've always used them.  It's just now there's a higher

22  volume of them.

23      So, you know, I think what -- I think it's a great

24  question.  I think it's what's on everyone's mind.  You know,

25  our census is, you know, when we filed was 272.  Today it's

1    278.  We have a pending board of over 28 patients.  We have

2    traditional Medicare on our pending board that's the highest

3    it's been in a long time.  Our Prestonwood facility was

4    closed until August.  Half of it was closed because of

5    construction due to the damage caused by the freeze of

6    January/February of '22 of '23, whichever month that was.

7    It's just reopened.  That side, we now have a census of 65 in

8    that facility.  It continues to grow.  Their pending board

9    is, I want to say it's something like 13 patients on their

10   pending board, which is incredible.  So we're seeing great

11   things happening.

12       Our census at 278 today is the highest it's been in

13   several months this year.  So we're seeing with census growth

14   will bring cash.  So census will continue with it's growth,

15   will continue to bring in the cash we need on a go-forward

16   basis to make sure that we get the landlord whole, that we

17   are able to secure new lending so that Alleon is made whole.

18   And then we continue to work with our current vendors through

19   the bankruptcy so that we can continue to take care of them

20   after we're able to exit.  And we'll be putting a plan in

21   place to do that.

22       Q.   You spoke about a lending facility that you're in

23   due diligence with.  Is that the first -- is that the first

24   replacement lender that you've worked with?

25       A.   No.  We had another one out of Nashville that we

1   were working with that we felt we were -- they told us they

2   were going to close on whatever day then didn't do it.

3        Q.   And how much was that facility proposed to be?

4        A.   They offered us 6 million in a line of credit.

5        Q.   And when was that?

6        A.   End of September, middle of September.

7        Q.   And that didn't close, though?

8        A.   It did not close.

9        Q.   Do you know why?

10       A.   They weren't real (inaudible word) with the deal

11  ultimately.

12            THE COURT:  All right.  You all are running

13  out of time here, so you need to wrap things up.

14            MS. KLEIN:  I'm about wrapped up, Your Honor.

15            THE COURT:  Okay.  These seem pretty far

16  afield from the issues we need to be dealing with for today.

17       Q.   So you were -- you're currently in due diligence

18  with a second lender?

19       A.   Yes.

20       Q.   What is that facility proposed to be?

21       A.   The last that I heard it's upwards of the high 3s

22  to low 4s for a line of credit.  That's my understanding as

23  of what the chief restructuring officer has told me in the

24  updates that we have.  And we're working hard to see if we --

25  because they also would like to do DIP financing with us,

1  which we've never done.  So we're looking into that, as well.

2      Q.   Okay.

3      A.   Yes, ma'am.

4           MS. KLEIN:  I think that's all I have, Your

5  Honor.  I'll pass the witness.

6           THE COURT:  Thank you.

7           MR. CARRUTH:  I understand the Court is

8  pressed for time.  Just a few questions, Your Honor, please.

9           THE COURT:  All right.

10          MR. CARRUTH:  Thank you.

11              CROSS-EXAMINATION

12  BY MR. CARRUTH:

13     Q.   Mr. McPike, my name is Jeff Carruth.  I represent

14  the landlords.

15         On the access to point click, a BAA agreement, or

16  business associate agreement would suffice for the

17  confidentiality issues that you were talking about?

18     A.   Yes.  We've sent one so that we could get that --

19     Q.   So not an NDA but a BAA would be sufficient?

20     A.   No.  I believe that what we've asked for is an NDA.

21     Q.   Okay.  But a BAA would suffice for what you are

22  asking -- well, let me back that up.  You have a BAA with the

23  Bank, correct?

24     A.   Yes.  But they don't have access to our software

25  system.

1      Q.    Okay.  So a BAA would be sufficient to get point

2  click access to the landlords?

3      A.    No.  We need the NDA that we submitted.

4      Q.    Okay.  And why is that?

5      A.    Well, there's a lot of data in there that's very

6  personal and very private, right.  So there's payroll data in

7  there by employee name.  That is not data that we have a

8  right to give away with an agreement, which means we've got

9  to try to scale down so that that can't be viewed.  There's a

10  lot of patient data in there.  And we want to make sure that

11  data is not used to give to another provider.

12      Q.    Okay.  But the payroll and the patient information

13  would be covered by the BAA; would it not?

14      A.    No, it would not.  Payroll data is not covered by

15  the BAA.

16      Q.    You could slice out the payroll data then?

17      A.    We can, but then it still would require us to have

18  NDA so that data is not used to be given to another provider.

19      Q.    Right.  But you're in bankruptcy now; do you

20  understand that?

21      A.    I do.

22      Q.    And you have disclosure requirements that -- some

23  of those concerns go away; do you understand that, at this

24  point?

25      A.    I do, but that's not one of them.

1    Q.   And so you have on your -- looking at your

2  budget -- and let me ask you this.  Do you intend to pay

3  December rent?

4    A.   Yes.

5    Q.   Okay.  So what -- how much cash did you have on

6  November the 7th?

7    A.   I don't have an answer for that.  I don't know the

8  answer to that.

9    Q.   Okay.  And, I'm sorry, what's your title, CFO?

10    A.   No.  I'm the COO.

11    Q.   COO, okay.

12     All right.  And the end of your budget, the end of your

13  current budget for November 7th through the 22nd shows that

14  you're going to net $38,000, your Exhibit 2?

15    A.   Okay.

16    Q.   Is that correct?

17    A.   I see that, yes.

18    Q.   Okay.  And what do you anticipate to collect from

19  November 22nd to November 30 -- I'm sorry, November 23 to

20  November 30?

21    A.   I don't have that report in front of me.

22    Q.   Okay.

23    A.   We have that, but I don't have that in front of me.

24    Q.   Do you have a guess?

25    A.   The projections, I think we're projected to collect

1    over 1.9 or 2 million this month.

2        Q.   I'm sorry, how much?

3        A.   1.9 to 2 million this total month is what we're

4    projecting.

5        Q.   Can you say that slowly, because I'm hearing like

6    two different numbers?

7        A.   I gave you two different numbers.  We're projecting

8    to collect 1.9 to 2 million in November.

9         Is that what you asked me?

10       Q.   Yes.

11       A.   Okay.

12       Q.   But you only -- through November the 22nd you only

13   collected 1.096 million, according to your budget.

14       A.   That's projected, correct.

15       Q.   And so you're projecting to come up with $380,000

16   additional over and above this budget by December the 1st?

17       A.   Correct.

18       Q.   Now, when you said you gave us Q-3 financials while

19   ago --

20       A.   Yes, sir.

21       Q.   -- those are accrual based; is that correct?

22       A.   I believe so.

23       Q.   So it shows -- your financials show that September

24   rent was -- I'm sorry -- yeah, September rent was paid, but

25   it was not paid?

1       A.    Right.  Because it was accrued.

2       Q.    Do you have any cash-basis financials?

3       A.    No.

4       Q.    Also back on your budget.  On the bottom right-hand

5   corner Remarkable Healthcare, LLC, the payroll and expenses

6   for that, there's $40,000.  Who is receiving -- or who --

7   who's payroll does the $40,000 consist of?

8       A.    The regional staff that is employed by Remarkable

9   Healthcare, LLC.

10      Q.    Okay.  What individuals is that?

11      A.    So that would include up to myself, Laurie Beth,

12  Diane.  It includes our regional nurse.  It would include our

13  regional billers, with some other people in there.

14      Q.    And this new financing that you spoke about, the 3

15  to 4 million, that would only -- would that take out Alleon?

16      A.    Yes.

17      Q.    Okay.  Would it pay your lease arrears?

18      A.    That is what we're working on now, negotiating with

19  them now.

20      Q.    Okay.  That would require more than $4 million

21  of --

22      A.    It would, that's correct.

23      Q.    And what is your understanding of the amount of the

24  total lease arrearage?

25      A.    It would be the lease amounts for September,

59

```
1   October, and now currently November.

2        Q.   And were there any amounts that were not collected

3   under the lease before --

4        A.   There was an amount that KRS is saying wasn't paid.

5   That's disputed, though.  That was in dispute.

6             THE COURT:  All right.  I'm going to cut you

7   off here.  It sounds like -- if you want to do discovery, you

8   can do discovery in the context of the final hearing.  This

9   is just the interim hearing, right.

10            MR. CARRUTH:  Yes, Your Honor.

11            THE COURT:  Okay.  And I thought I understood

12  you all had largely agreed on the budget, so I'm not quite

13  sure --

14            MR. CARRUTH:  I'll pass the witness, Your

15  Honor.  Thank you.

16            THE COURT:  Thank you.

17       All right.  Anything further?

18                 REDIRECT EXAMINATION

19  BY MR. CASTILLO:

20       Q.   Just as part of the adequate protection that you're

21  giving to Alleon, you mentioned there's a CRO.  Who is that?

22       A.   Michael Shrek.

23       Q.   Who put him in there?

24       A.   Alleon.

25       Q.   And who does he report to?
```

1    A.    Alleon.

2            MR. CASTILLO:  Okay.  Thank you, Judge.  No

3 further questions.

4            THE COURT:  Thank you.  All right.  The

5 witness may step down.

6            THE WITNESS:  Thank you.

7            THE COURT:  Anything further?

8            MR. CASTILLO:  No, Your Honor.

9            THE COURT:  Okay.  So does anyone wish to make

10 any further arguments with respect to the motion to pay

11 pre-petition salaries and wages?

12    All right.  I've reviewed the motion and given that

13 there's no objections, I'm going to approve it.

14    And then on the cash collateral, does anyone wish to be

15 heard any further on the cash collateral matter?  I thought

16 the order was largely agreed to.

17            MR. CASTILLO:  There are red lines, Your

18 Honor --

19            THE COURT:  Right.

20            MR. CASTILLO:  -- behind the --

21            THE COURT:  But that's part of the agreement,

22 right?

23            MR. CASTILLO:  It doesn't have what was just

24 reached is that they were going to talk about a third-party

25 biller and give additional information to the landlord.

1  Those need to be built in.

2                    THE COURT:  Okay.

3                    MR. CASTILLO:  These were prior --

4                    THE COURT:  So you're agreeing to that, right?

5                    MR. CASTILLO:  Yes.

6                    THE COURT:  Okay.  So you'll add that in?

7                    MR. CASTILLO:  Yes, Judge.

8                    THE COURT:  Ms. Klein?

9                    MS. KLEIN:  (Inaudible few words due to not

10  speaking into a microphone.)

11                    THE COURT:  Can you speak into the microphone?

12  We're not picking you up all of the time.

13                    MS. KLEIN:  I'm sorry.  Yes, no, Your Honor, I

14  had nothing more.  I was just going to -- to the extent we

15  had red lines to discuss with the Court, but I think --

16                    THE COURT:  All right.  I'll approve the use

17  of cash collateral on an interim basis as agreed to by the

18  parties and as I've seen in the exhibits that have been

19  submitted to the Court.  I need you to upload those as soon

20  as you can, obviously.

21                    MR. CASTILLO:  Will do.

22                    THE COURT:  Final hearing, I'm looking at

23  November -- let's see, November 28th at 1:30.  How's 1:30?

24                    MR. CASTILLO:  Got it.

25                    THE COURT:  Is that workable for everybody?

1              MR. CASTILLO:  Yes, Your Honor.

2              THE COURT:  Okay.  So final hearing November

3  28th at 1:30.

4        Okay.  And if you file any other motions in any of

5  these cases that can be where you -- where you've provided

6  sufficient notice, you can add it to that docket.  But you

7  must first speak to my courtroom deputy about getting it

8  scheduled on the docket.

9              MR. CASTILLO:  Okay.

10              THE COURT:  Okay.  All right.  Anything else

11  for purposes of today?

12              MR. CASTILLO:  No.  Thank you very much, Your

13  Honor.

14              THE COURT:  Thank you.  All right.  Parties

15  are excused and we are adjourned.

16                  (End of Proceedings.)

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2          I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true, and complete

4    transcription of the proceedings as heretofore set forth in

5    the above-captioned and numbered cause in typewriting before

6    me.

7

8

9

10

11

12

13

14                         /s/Cindy Sumner

15                    _____

16                         CINDY SUMNER, CSR #5832
                           Expires 10-31-2024
17                         Cindy Sumner, CSR
                           5001 Vineyard Lane
18                         McKinney, Texas 75070
                           214 802-7196
19

20

21

22

23

24

25